United States of America, XREL Jeffrey D. Milner, M.D. v. Baptist Health Montgomery, Prattville Baptist Team Health. And Mr. Watkins, I see that you've reserved six minutes for rebuttal, and whenever you get situated, you may proceed. May it please the Court, I am here in support of all options for the appellant, Dr. Jeffrey Milner. The sole reason for the District Court's order below is that this Court's Ragsdale decision tied its hands and prevented it from following the compelling and persuasive authority that was presented to it from the Seventh Circuit and the Fifth Circuit below. However, we believe that the Ragsdale case does not decide this case. And, in fact, a decision in favor of Dr. Milner could sit comfortably beside the existing precedent in Ragsdale. So I know that you're arguing that Ragsdale was a mirror image of your case, but can you explain to me how that's relevant to the legal analysis in Ragsdale and why Ragsdale would not be binding on us? Absolutely, Your Honor, and I must confess, when I first saw this case, I'm only appellate counsel. I did not represent Dr. Milner below. At first, I thought, why should it matter if we simply change the order? The key factor is that key tam is unique. Two points here. First, the elements of res judicata. The elements of res judicata, we don't contest the first two. It's same parties, same claims. That's what we contest. Same parties intrinsically requires the Court to look at the interests that were represented in the prior case. But didn't Ragsdale address that very argument about the uniqueness? There, the plaintiff made the argument, quote, Miller contends that after the government intervened in Rubbermaid 1, and there was an intervention, Rubbermaid 1, and assumed primary control, he was merely a realtor and not a true party. And we responded that the parties are identical because the act makes clear that realtors have unrestricted participation in the litigation. In other words, the fact that the United States was in there did not affect the analysis because the realtor always has primary control. And, indeed, the Supreme Court in Polanski seemed to stress that very point when it said, quote, when the government has chosen not to intervene, as it is here in a key tam case, it is by definition not a party. Your Honor, it is the real party in interest. We all agree. The Polanski court said that as well. I think the key issue here, what we've highlighted, the government interest that is a total distinction with Ragsdale is the government interest in what we've termed a passive recovery for ease of discussion. And that interest, of course, by necessity, was not present in Ragsdale because of the order. The initial suit, the government was not involved at all. The government had no notice. When the order is flipped, that is only – it's only then that the government interest is found. I don't disagree with you that there is something different for the government there. And maybe as a matter of policy, that doesn't make sense. But there's two things that I'm having trouble with that it sounds like Judge Branch might have trouble with, which is that we didn't say that that was dependent on the analysis. The party analysis was simply, are they the same and are they not? In Ragsdale, we said they're the same, period. In other words, we didn't rely on, well, is the government going to be precluded here and there? And the other is, under a prior panel precedent rule, we don't have an overlooked argument exception. In other words, a holding and its necessary reasoning are the holding and necessary reasoning, regardless of whether there's a really good argument that we somehow overlooked or wasn't made to us. And I just don't know how to reconcile those things. Oh, absolutely. The prior precedent rule, of course, we have no dispute with that whatsoever. I think the key thing to look at in Ragsdale, I think all parties agree, is sort of the critical case on the legal points here. I have a factual point that I'm hoping I'll get to as well. Shurik, also. But the per curiam opinion, Shurik, it's very limited analysis, same situation as Ragsdale. Well, a little different because there, and this gets to it maybe a little more, but there they were consecutively filed, not, or I'm sorry, they were contemporaneously filed and they weren't successive. And that means that, that indicates to me that timing isn't all that relevant. In other words, that would have changed the analysis there a little bit if they were filed on the same day, as opposed to here where it's one ruling and then another. Your Honor, I think that's not quite right. Okay. It's not one ruling and then another. The second suit was filed while the first suit was pending four months later. So I think it's actually similar to Shurik in that. Okay. But put that to the side. One of the points we made in both our brief and our reply brief is that the same party's analysis, that prong of res judicata, is frankly not actually present in Ragsdale. And let me tell you what I mean. The initial suit was a QI-TAM, and in that initial suit there was a settlement. Oh, it was a settlement. The problem is we didn't say this and rely on it. You're sort of reading stuff in there to it, and it may be that that's possible that that happened. But when it comes to opinions, we can't look below it. We only look at the face of the opinion itself and those facts that are material to them. So certainly there was a settlement there, but there was no indication of release or anything like that. Fair. Is that true? I think that they actually disagree. Okay. Tell me. In Ragsdale, in the opinion, I don't actually have the pencil. I'm sorry, Your Honor. All right. But I have it in front of me. Tell me where. The best evidence is, of course, as you say, what the Ragsdale court said the settlement did. And the Ragsdale court specifically said it was a settlement among all parties, right, which by definition must have included the government in the first case because it was a QI-TAM and it intervened QI-TAM at that. Therefore, because all the parties are present, the government interest is fully present in every way conceivable, as well as the plaintiff for later in that case. Where do you say it was a settlement to all parties? I'm looking at Ragsdale right now. This is at Penn site 1237, it looks like. When Rubbermaid I settled, I'm sorry, so at the time, for whatever reason, he did not state an FCA claim for retaliatory discharge in his complaint. After the government intervened in the lawsuit, Miller remained as a realtor. When Rubbermaid I settled, Miller consented to a settlement agreement and received $185,000, his bounty for reporting the fraudulent activity. Subsequent to the settlement, he filed a retaliation. Where are you seeing that it's with every party? I don't think it actually says same parties, but it does say that the government was. . . You said all parties. The way you said it was the settlement included all parties. That's what you said. And I'm asking you where you see that. In my record here, I don't have the exact words in front of me, I'm seeing that at 1238, barring a later suit on the same cause of action, but my recollection is in the previous sentence of the paragraph, it talks about that there was a settlement with the government as well as the relator plaintiff. I'll take a close look at it again, but go ahead and continue. The other issue that we wanted to point the government to, or sorry, the court to, is in our 28-J letter, the Halleckman decision. Now, granted, the decision is a district court decision in the Southern District of Florida. It basically adopts our argument, but the most notable thing about the Halleckman decision was the government's statement of interest. Here, in this action, we don't have a statement of interest. I think the most notable part about that decision is it relegates Ragsdale to a single one-sentence footnote. It doesn't engage with it at all. It simply says, well, it was flipped here, so it doesn't count. And I just, I have a hard time seeing that that is a persuasive discussion of how we need to deal with Ragsdale. I 100% agree that it's not enough to say the order is different and that's the end of it. The key thing for us is the same parties element of res judicata necessitates a look at the interests that were present. It's the parties and their privies. And in our instant case, the government had no notice. It was not present in any way whatsoever. The government's submission— But the privy only comes to the case if the real party's not there. In other words, if it's real party versus real party in both lawsuits, then we don't need to look to privies. Privies only comes into play where it's real party and then real party's affiliate. And then we look to, is that in privity with the real party, such that the interests are the same. But we don't do that where it's the actual party, and here we have both. Well, we argue that it's not the actual party because it's this hybrid interest. And as the government's filing and Hallickman said— But I would just go over the cases. They are the real party and interest. I mean, that's what the case law says. Whether it's true or not and whether it should be the government's and they're sort of acting on behalf of the government, maybe we're wrong on that, but that's what we said, no? And you're making factual distinctions, but I would point back to what Judge Luck is saying about Ragsdale. Ragsdale, in the text of the opinion, says the parties are identical. It has a footnote 7, and footnote 7 is extraordinarily broad and it's not talking about the specific facts of the case. It says the act makes clear that with certain exceptions not relevant here, relators have unrestricted participation in the litigation. That's the justification for the parties being the same. So going into the details, going behind the scenes of Ragsdale, I just don't see how that's going to carry the day. I think you're going to have a hard time getting around Ragsdale on that issue. Let's shift gears in that case and then the factual issue that I wanted to bring up is as to the same claims issue. I'll just briefly treat it and then we can talk about it more in reply. There's general arguments about the sealing period and the trial being inconvenient, but we also discuss in our briefs there's specific factual allegations in this case, and those specific factual allegations do not track with the allegations in the initial case, and so much so, in fact, that I direct your honors to- Except that the question is do they stem from the same nucleus of operative facts? Not if the allegations are the same, but do they derive from the same thing? And here what we said in Shrunk and Ragsdale is they do, when looking at it, operate from the same operative facts, even though one deals with unemployment retaliation and the other is the underlying fraud, it all starts with the fraud case, right? Interestingly, the initial district court decision, and what we can call number one, specifically rebutts that point. Now, I would direct your honors to 48-3, which is the- Yeah, but the district court, he made a mea culpa on that one, didn't he, in the second order? Didn't he say, I know what I said in the original order, but now having taken a close look at it and now seeing I'm on summary judgment or I'm on this dismissal, and so you're talking about Milner 1 in terms of the northern district case? Exactly. Okay. Yes, there's no mea culpa in this one. But we look at the allegations. We don't look at the district court's orders. We look at the allegations. The district court here discusses the allegations. At the bottom of the first column to the top of the second column, this is 48-3. The ECF number is page 7 of 9. Can I just look at Ragsdale? We're looking at 1240. Quote, both claims grew out of the common nucleus of operative fact. Rubbermaid engaged in illegal conduct, and Milner's discovery of that conduct led to his discharge, a series of transactions closely related in time, space, and origin. Isn't that exactly what we have here? You have a client who saw fraud, who reported fraud, who was fired as a result, and brought lawsuits. Aren't they exactly the same as- The first district court judge specifically said that there are no allegations sufficient to support a reasonable conclusion that Milner's employer could have feared being reported to the government for fraud or sued in a key TAM action. So the initial district court decision that dismissed Milner 1 said there's nothing here remotely related to a key TAM. Thank you. Mr. Hayden. May it please the court, Adam Hayden for Team Health. Judge, I'd like to point you to page 1238 of the Ragsdale decision. It says the parties reached a settlement agreement and executed a stipulation of dismissal, barring a later suit on the same cause of action in 1501-1502. Yeah, it never said that all parties settled, did it? No. Or they settled all claims for all times and released everything. That's the point. Right. What they're talking about is, is there a final judgment on the merits? Because when you go to Citibank, it says at 1501-1502, it is clear that a dismissal with patience at any stage of a judicial proceeding normally constitutes a final judgment on the merits, which bars a later suit on the same cause of action. So they weren't saying that this was bound by the settlement agreement. It was saying that the stipulation of dismissal is a final judgment on the merits, and that's why the rest of the opinion talks about res judicata.  Next, Your Honor, we agree that Ragsdale, of course, controls this case. But we also say that Ragsdale is correctly decided. And the reason it's correctly decided is because two assumptions in Dr. Milner's argument fail when compared to U.S. Supreme Court precedent and the text of the statute. The first assumption is that he is, that Dr. Milner is just a representative of the government. Well, in Vermont's case, it says in the TTAM action that the relator also has his own stake in the action. I'm not sure that's exact. That is part of the argument. But there's a larger part of the argument here that I have to say absent precedent has some persuasive value. And that is that the government is an independent party here, has an interest in this thing, maintains an interest in the suit throughout, can be involved any time it wants and hook in any time it wants, is entitled to part of the recovery. And its interest, if they're reversed, if we, in other words, if the nongovernment suit, the retaliation suit comes first, as it did here, the government sort of loses out without ever being the opportunity to be able to come in. I mean, that's the argument. I'm not sure it's persuasive at the end of the day, but it isn't just that the government is another party here. There's a larger policy interest. Well, yes, I think that's Dr. Milner. But on that point, that's the second reason I think he's wrong. If you look at Eisenstein, and they say, they quote part of Eisenstein when they say the government is bound in all FCA actions. Well, they talk about key TAM actions. Of course, they're not talking about retaliation actions because there they don't get the notice. They don't get an opportunity to intervene. All right. No notice, no opportunity to be heard. Well, in the next sentence in Eisenstein, it says non-parties may be bound. And it cites to Taylor v. Sturgill. And in Taylor v. Sturgill, the U.S. Supreme Court says that federal conclusion law is subject to due process limitations. And classic due process is if you don't have notice, if you don't have an opportunity to be heard, you can't be bound by that retaliation claim. So the government is not bound by that first file retaliation judgment. I know, but that's not the question. The question, of course, it doesn't really matter to the government in the retaliation claim. What matters is did I lose my opportunity to participate in a key TAM that I otherwise would have. That's the question. You did lose it via that first judgment because it doesn't bind you. Okay, that's the government. The government wasn't a part of the retaliation claim, so res judicata does not apply to the government. Conclusion is limited by due process under Taylor v. Sturgill. So it has every right, it could have intervened in this case, tried it to a judgment of the merits if it wanted to. I know, but that's not practically what would happen. Practically what would happen is what happened here, which is the party would file the second lawsuit. You'd immediately file a motion to dismiss because of res judicata, and it would be granted. And all really before the government had an opportunity to decide to weigh in or not. Now, I think the government did decide here to weigh in, but a lot of that would happen independently of the government ever deciding whether to intervene or not. And the government rarely is bringing these cases proactively on its own without a realtor. That's the whole point of the statute, of the key TAM statute. Right, but in this case, Your Honor, the government and in Ragsdale, the government took years to investigate, so they did have an opportunity to intervene, a realistic one, and then they file something and say, we, in our case, choose not to intervene. So your point is the motion to dismiss doesn't come until after it's unsealed. So the government would have the opportunity to be able to get in. Yes, Your Honor. And with respect to the key TAM judgment, does that bind the government such that it could not bring a second key TAM case later if it wanted to? Well, in this case, that's barred by the statute of limitations. But here we say, if you're going to be bound, you have to have, like in every race judicata case, a final judgment on the merits. All right, and if so, Justice Thomas in Eisenstein says, well, if you're worried about being bound by a final judgment on the merits, intervene. But then in this case, in our case, Justice, Judge Huffaker never got to the merits. He said, race judicata affirmative defense, I'm not getting into whether the claims meet Twyla and Iqbal. And so he never got to the merits. And so in our view, the government would have another opportunity if it wasn't barred by the statute of limitations. But I mean, again, to bind the government, you have to have a final judgment on the merits and the key TAM claim. And we haven't had one yet. And race judicata, like if we, suppose there's another sealed complaint that we have another relator who, a whistleblower who has filed something under seal, the government would be privy to that information. We wouldn't be. But that certainly wouldn't bind anybody else who came forward. Correct. Correct. You'd have to have a public disclosure bar, for example, that would, if that happened. But also, if I could, I'd like to get back to the first assumption. And that is, with respect to the same parties, for race judicata to apply to Dr. Milner, he has to be the same party in both cases, the retaliation case and the key TAM case. Well, he's in the individual capacity in the retaliation case. And so the question is, and my opponent argues several times in his brief, well, no, he's just the representative capacity in the key TAM case. Well, under Vermont, in that case, in fact, my opponent on page 13 of his brief quotes Vermont in part and says that the relator is the statutorily designated agent of the United States. But if you go to Vermont on page 792 and you actually read the whole quote, Justice Scalia says that's the argument I reject. And it can't be just that because under the text of the statute, under 3730B1, it says that the relator brings the case for the person, i.e., the relator, and for the United States. Under C1, it says that even after the government intervenes, the relator can continue as a party to the case. And on the next page, 793 of Vermont, it says that the FCA affects a partial assignment of the government's claim, that 30 percent, to the relator. Okay, well, if you have your own money at stake and you're a party under the statute, you're in your individual capacity, at least for that part. And so you are the same parties. Polanski seems to answer that question as well. Yes, Your Honor, exactly right. And so our view is that he's the same parties. And my opponent says, you know, that's critical to his case. Well, I agree it is critical to the case. But the Supreme Court held exactly the opposite of what he says on page 13 of his brief. And so we have the same parties. We have the same cause of action. And I think we do here. I think the Western Unicom applies, regular Western Unicom. If the government had intervened, do you believe you can dismiss the whole thing? You could have dismissed the whole thing? Or you can only dismiss S.T.A.M.? If the government intervened, so the government chooses to intervene, your motion to dismiss wouldn't be a motion to dismiss the entire cause of action. We could have dismissed the key TAM claim without the government, you know, signing off. You would only be dismissed this particular defendant? That's right. Or this particular plaintiff? That's right. And you'd have no problem with an opinion that said that? No problem. Okay. Because what we're saying is that Rachel Dikotter applies to Dr. Milner only here because he's the one that had notice and opportunity to be heard in the retaliation case. Heck, he filed it. But the government did not have the opportunity to be heard or get notice of retaliation, and it can't be bound by it. Under Eisenstein and Taylor v. Churchill, due process, it cannot be bound. So that fear that you have, well, maybe they'll be bound, is not realistic. All right. Let's talk about the fourth element, the cause of action element. So he argues two things that I could tell. One we talked about, which is the nucleus of operative fact point. And he's saying, and, again, this has some appeal to it, but I wonder what your view of our precedent is, that, listen, whether I'm fired for making a complaint is just factually different, both in allegation and just in terms of logic, from whether I witnessed fraud and the nature of the fraud and what recovery there needs to be on the fraud. Why are those things the same? And then the second argument is sort of a practical argument, which is stuff that we look at, and specifically with regard to service of process, if you bring the claims together and how they interact, especially with regard to Rule 4M. Sure. With respect to your first question on are they the same common use of operative fact, well, here you have an underlying opioid overprescription scheme that has been alleged. Right. And there's one claim that says, well, I got fired for reporting it. Then the other claim says, and they got rich by billing for it. But it's the same scheme. I agree. But isn't it different elements? But aren't they different elements? I mean, there's a retaliatory where you're a whistleblower and you're being retaliated and you're losing your job as a result of blowing the whistle. And it's different than saying, and this company is involved in a scheme to overprescribe opioids. Yes, Your Honor. There are different elements. But that's the difference between claim preclusion and issue preclusion. In claim preclusion, you're bound for claims that were brought and could have been brought. And of course, if it's a different claim, it's going to have different elements. But that's why the common use of operative fact test makes sense. It says, okay, even if you have different claims with different elements. Yeah, but even the proof, and this goes to Judge Lewis' point, even the proof is different. In other words, if I'm proving up, forget elements. If I'm proving up my claim, whether there was, in fact, opiate fraud at the hospital is completely irrelevant to whether I reported it. And because I reported it, I got fired for it. The truth of that does not matter in a retaliation claim where it very much matters in a fraud claim, right? Well, I think you have. What are you reporting? You're reporting the opioids. I know, but whether I'm right or wrong does not matter to a retaliation claim. Let's take racial discrimination. Whether there, in fact, was racial discrimination does not matter to a retaliation claim. The only question is, did I complain about racial discrimination or was I fired for complaining about it? I understand. Right. I know you understand. However, we have the tightness. There's some cases, and I think the Laird case, how the Fifth Circuit is one, that really goes tight to those elements. But in our case, in Ragsdale and in Shurik, they look at the underlying scheme and say, okay, do both of these claims tie to that scheme? And I agree. They don't have to prove that the scheme is truthful, that they've truthfully alleged an illegal scheme. But it still has to be a scheme that involves the submission of false claims to the government to get paid. And so what's he going to do to prove this case if he tries the case? If the scheme is unrelated, if the fraud scheme that I'm seeking to bring the QUTAM action on is unrelated to the thing that I complained about, would that fail the transaction test or the common? I think it has to be, if it's a different scheme. Yeah. Okay. So let's say, just for example, let's say that there was an opiate scheme, and that's the basis of my second QUTAM action, but I was fired for complaining about? FMLA. FMLA, or a different fraud scheme. The nurses were stealing the PPE equipment. Right. I think that is not the same, that would not be the same cause of action. That's millennium, where you have a guy that says he was fired for racial discrimination and a breach of contract, he wanted a bonus from his employer, but then he has a separate, and they were overbilling the government for medically unnecessary treatment. And okay, well that's not the same. Got it. No problem with that. But here, both things key right out of the opioid prescription, overprescription scheme, both of them say you reported that scheme, you made money off of that scheme. It's the same cause of action. Well, but it seems a little, it seems sort of difficult to say that I'm getting fired for reporting this scheme, and so they're retaliating against me as a result of that. And that is a different proof, but now I can't, if I fail in my retaliation claim, because that's a difficult, maybe a difficult cause of action, that I then can't bring this QUTAM. Well, you could. You could have brought them both together. Okay. That's the whole point. That race judicata, the point of it is that you don't get to strategically sever your claims in order to get two bites out of the apple. That's what Judge Huffaker said in this case. And specifically what he could have done is brought them both together, but instead he filed the retaliation claim in the northern district of Alabama, and he filed the retaliation claim in the middle district of Alabama. With the short time you have left, can you address the practical argument that they raise? Under Rule 4M in the service there, claims with QUTAM and retaliation are filed all the time. And what happens is, because it's statutorily sealed, and it's statutorily as a defendant under 3730B, have 20 days to answer after you're served after the unsealing. And so the courts have said, I think they're saying, that 90 days doesn't start to run until after the unsealed complaint. Are there other ways to address it? Is there a way to do, to sever one out or to only seal the QUTAM? In other words, you have a blank count two, but unseal count one? To seal the complaint, Your Honor. So it would be the whole complaint. Thank you. That's it. My time is up. Thank you so much. Thank you. Mr. Watkins, you have six minutes left for rebuttal. Thank you, Your Honors. Looks like five points. First, on to the Ragsdale, the settlement there. I think I have to admit, I misspoke. It didn't say all the parties. It simply said the parties, which I was reading to include the government by necessity. It was an intervening case, as well as the relator and the defendant in that case. I think that's a fair reading of it, but it did not use the word, the court did not use the word all. So I'm going to fess up to that. Relatedly, the Vermont case brought up by my brother over here, I think we're not really disagreeing with the notion that there is an individual interest of a relator and a non-intervening. In other words, you're not making a capacity argument. You're making a bit of a different argument, right? Or are you making a capacity argument? Well, it's not a pure agency. We're not saying there's a pure agency relationship. Key TAN is unique, as Justice Scalia said in the footnote in Vermont Natural Resources. The SCA has a Key TAN, and there's a few other statutes with Key TAN provisions, but they're very seldom used. It is a unique situation where the relator, particularly in a non-intervened case, has a hybrid role of representing both the relator's personal interest in that bounty, as well as the government's interest in a passive recovery. So that's what we wanted to emphasize there, that there is a hybrid role. Second, cited in a reply brief at page 3, I think very instructive for understanding the critical aspect of the False Claims Act includes the unintervened Key TAN cases. As Judge Luck mentioned, this is a vital aspect of enforcing the False Claims Act. The government submission of the Hallequin case discusses that Senate report from the 1986 Reagan-era amendments, as well as this Court's decision for Key ideas. In that Senate report, the centrality of the Key TAN, in particular, even when the government can't intervene, is discussed at length. And so that's another point we wanted to emphasize. I know, but what your opposing counsel says is there's really no harm to the government at all from any of this. In other words, the Seventh Circuit's views are sort of overblown. Here, the government isn't precluded under res judicata. Only your client is. The government has an opportunity to intervene and doesn't. And the best way to do it is what the district court did exactly here and what we said in the Diaz case, which is dismiss without prejudice, in which case the government can then bring the case if it wants to later on. So, like, what harm is there to the government in all from this? The first point, I enjoy the concession from the other side saying that they would have no issue whatsoever with the government bringing a subsequent case because that's not at all clear, and this Court left that question open in our Key Ideas. So that potentially could be addressed in this decision, although it might be dicta. But secondly, I think it is incorrect to say the government has no harm. It is clearly incorrect, in fact, because there's a separate distinct interest that is critical, as I just said. You can read the Senate report in 1986, critical to the heart of the False Claims Act, which is an unintervened passive recovery. And a passive recovery, we have a theory, Judge Luck, you mentioned the concept that perhaps there is some other person who has filed, a relator that has filed a key tam, perhaps before Dr. Milner, I doubt that that potentially could go. But if there was not something that's ruined that's been sealed for five, six years, however long it's been, then there cannot be a new relator because of the first filed bar. So this is the one shot for the government to have its passive interest protected. It's only here. So there is a harm to the government. Except for itself. I mean, it can protect its own interest. I just, I get it. If there's a windfall to the government, the government's not going to deny it. But if the government really thinks that there is going to be a passive interest, if the government thinks there's some sort of fraud here, the government can bring a criminal or civil case at any time it wants to, or intervene any time it wants to, or file the lawsuit itself. I just have a hard time understanding how it's a true harm. I agree the government can do that. And now we all agree that the government can do that. However, I disagree that that is no harm to the government. Because if we say that the government can always just intervene and always run the ship itself, then that eviscerates the notion that an unintervened key TAM is critical to the False Claims Act. And that's what the government has said. That's what this Court has said in her key ideas. It basically eviscerates the whole concept of that being a vital part of the False Claims Act. So it undermines the entire point of the False Claims Act. But is the False Claims Act eviscerated by a decision of the court or by the actions of your client in walking into res judicata? Not bringing it originally, as it should have. Your Honor, I think the key point there is, for example, I 100 percent agree that a potential relator or just a private citizen could eviscerate a False Claims Act or at least a non-intervened False Claims Act by simply going to the press or filing such a terrible complaint. Or dismissing himself. Sure, sure. But the uniqueness of res judicata is that, unlike every other situation that we've outlined just here, is that it requires, under the same parties and privies element, a look into the government interest that is not present if it's simply... I don't see how it is a look into the government's interest. I don't see how, at least under our test. Maybe we should, but our test is simply, is this side of the V the same as this side of the V or is it a privy of this side of the V and this side of the V? And here, you have both the side of the V. I think the test is broader than that. I think it's not simply the side of the V. Show me in Ragsdale or Shurik where that's the case. I'm just having trouble understanding that. And you don't need to. That's more rhetorical. I've read them both myself many times. But you keep saying that this would eviscerate the protections of the False Claims Act. And Judge Luck, I think, has walked you down the path of why the government always has the power to intervene. And so I don't know that it's eviscerating the False Claims Act. But also, there is no carve-out in the False Claims Act that says res judicata will not apply. So there are always steps that the relator can take that can harm the, how have you put it, passive interest of the government. Filing after the statute of limitations. There is no carve-out there. We argue that this Court's res judicata jurisprudence is what creates the carve-out, if you will. Thank you. And we have your case under advisement. And we are in recess for the next ten minutes. All rise.